UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARY COONEY,

                Plaintiff,                No. 08-10337
                                              Hon. Gerald E. Rosen

v.

BOB EVANS FARMS, INC.,
a foreign corporation,

                Defendant.

_____ /

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
The U.S. Courthouse, Detroit, Michigan
on_____August 17, 2009_____

PRESENT:   Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

## I. INTRODUCTION

In this retaliatory discharge action, Plaintiff Mary Cooney is suing her former employer, Bob Evans Farms, Inc. ("Bob Evans"), alleging that her employment was terminated in retaliation for threatening to file a complaint with the Michigan Department of Civil Rights. Plaintiff also claims that she was discharged for opposing sex discrimination in the workplace, in violation of the Michigan Elliott-Larsen Civil Rights Act. This case arose out of Plaintiff's report to Bob Evans management that she believed

she witnessed co-workers using illegal drugs on company property. The Court's subject matter jurisdiction rests upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

The matter is now before the Court on Defendant Bob Evans' Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion and Defendant has replied. Having reviewed and considered the parties' briefs and supporting evidence, the Court has determined that oral argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

### A. PLAINTIFF'S EMPLOYMENT WITH BOB EVANS

Defendant Bob Evans operates a chain of full-service, family-casual restaurants. Plaintiff Mary Cooney was hired under an employment at will contract to work as a server at a Bob Evans restaurant in Fenton, Michigan. She was employed there from February 28, 2006 until her discharge on December 16, 2007. For the period relevant to this case, Plaintiff reported to assistant managers, Chris Carpenter and Joylyn Fuller. The general manager of the restaurant was Lisa Chapman, who had authority to hire and fire staff. She, in turn, reported to Kevin Andrachek, Area Director.

Plaintiff claims to have performed her duties in a diligent and satisfactory manner over the course of her employment—prior to working at Bob Evans, she had 25 years experience in the food service industry. However, Bob Evans management described her as "not a model employee," (Chapman Aff. ¶ 16), citing specific incidents over the course

2

of her employment in which she was admonished for comments made to co-workers or customers.  In November and December 2007, Plaintiff was disciplined on two separate occasions by assistant manager Carpenter, who had joined the Fenton restaurant staff in late 2007.  Plaintiff later contested how those incidents were documented in her personnel file.

**B.      BOB EVANS' WORKPLACE POLICIES**

Bob Evans maintains a code of conduct and work rules, which are included in an employee handbook distributed to new employees upon being hired.  The work rules set out expected standards of conduct for all employees.  Violation of these rules can result in discipline up to and including discharge for the first offense.  The company also expressly reserves the right to depart from the disciplinary guidelines set out in the work rules.  In addition, the employee handbook states:

> If a member of the management team determines that your conduct may warrant termination, you will be suspended pending an investigation by the management team.  While suspended, you should not report to work.  The circumstances surrounding the suspension will be reviewed and a meeting will be scheduled, normally within three days following the suspension, with you and the General Manager, if available.
>
> Prior to your scheduled meeting, you may be asked to provide additional information.  If you are not, you should contact your General Manager and any other member of the management team to make sure that they have all the facts, which you believe will help explain the circumstances surrounding your suspension.

(Cooney Dep. Ex. C 32.)  Generally, disciplinary measures taken against employees are memorialized in "Employee Conversation Sheets," signed by both the manager and the

3

employee, and kept in the employee's personnel file.

The company maintains an "Open Door Policy," which encourages employees to approach members of management to resolve problems.  If an employee is unable to reach a satisfactory resolution with her general manager, she is encouraged to approach the Area Director or higher echelons of management.  Finally, the company strictly forbids the use of illegal drugs or controlled substances on company premises.

## C.     PLAINTIFF REPORTS ILLEGAL DRUG USE TO MANAGEMENT

On two Monday mornings in October or November of 2007, Plaintiff claims to have observed Chris Carpenter and Terry McKay, a kitchen employee, smoking marijuana in the parking lot at work before opening the restaurant.  Plaintiff testified that she smelled the odor of marijuana when she pulled up in her car and she saw the two individuals passing what appeared to be a joint, or an unfiltered cigarette, between them.

In the weeks that followed, Plaintiff testified that she struggled with whether to report the incidents to management because she had a good relationship with Mr. McKay's parents, who were frequent patrons of the restaurant.  In early December, Plaintiff told a co-worker, Susan Watson, about the incidents.  Ms. Watson advised Plaintiff to report her concerns to management.  A few days later, Plaintiff spoke about the incidents with Susan Blalock, a grill cook and server, who had been trained as a shift leader.[1]  Ms. Blalock also advised Plaintiff to report the incidents to Lisa Chapman, the

---

[1]  Shift leaders fulfill basic management duties when a manager is unavailable, but are not considered managerial employees.

4

general manager, or Joylyn Fuller, one of the restaurant's assistant managers.[2]  Ms. Blalock then, apparently without Plaintiff's knowledge, discussed the allegations directly with Mr. Carpenter, who immediately notified Lisa Chapman on December 11, 2007. Mr. Carpenter categorically denied the allegations and offered to take a drug test.[3]  After consulting with Kevin Andrachek, Ms. Chapman commenced an investigation, including interviews with Mr. Carpenter and other employees who claimed to have heard Plaintiff talk about the drug incidents during the relevant period.  No one could corroborate Plaintiff's allegations.

On December 12, 2007, once Ms. Chapman's investigation into the allegations was already underway, Plaintiff approached assistant manager Fuller to report the alleged drug use on company property.  According to a statement Ms. Fuller later wrote out at Ms. Chapman's request, Plaintiff also told Ms. Fuller that she felt Mr. Carpenter "had a target on her head," and that she was "tired of being a target for [Mr. Carpenter]." (Chapman Dep. Ex. 6.)

On December 13 and December 14, 2007, Ms. Chapman gathered the following

---

[2]  Although Plaintiff later testified that she did not recall speaking to any other employees about the allegations, at least two other employees also reported that they had heard Plaintiff talking openly about the allegations during this period.

[3]  Following her termination, Plaintiff contacted Kevin Andrachek to report what she believed to be unfair treatment.  During this call, Plaintiff argued that Mr. Carpenter should have been subjected to drug tests when Plaintiff first reported the suspected drug use.  Mr. Carpenter ultimately took and passed a drug test on December 19, 2007.  There is no indication in the record that Mr. McKay was ever subjected to a drug test at the direction of Bob Evans.

5

additional information from employees, which she requested they memorialize in writing:

- Susan Blalock reported that she overheard Plaintiff talking about the alleged drug incidents on December 3, 2007, that Plaintiff later told her directly about the incidents on December 9, 2007, and that Plaintiff told her she was mad at Terry McKay and "wants him fired." Ms. Blalock further stated that she had never witnessed any drug use at the restaurant, though she had been scheduled to work on numerous Monday mornings during the relevant period.

- Stacy Watson reported that Plaintiff talked to her on December 3, 2007, the day after a disciplinary action taken by Mr. Carpenter against Plaintiff for an unrelated incident in the restaurant. Plaintiff allegedly told Ms. Watson that Mr. Carpenter "didn't want to piss [Plaintiff] off since she knew things about him," and when prompted for more information, told Ms. Watson about the alleged drug incidents.

- Rodger Watson reported that Plaintiff had given him rides to work regularly on Mondays mornings in the preceding months, but that he never witnessed Mr. Carpenter or Mr. McKay smoking marijuana on those occasions.

On December 14, 2007, Ms. Chapman met directly with Plaintiff for the first time since beginning the investigation. She asked Plaintiff which dates the alleged incidents took place. The parties dispute whether Plaintiff then actually asserted that she knew the exact dates of the alleged incidents or if she said she was unsure. Plaintiff testified in her deposition that she could not give precise dates, remembering only that the incidents occurred on Mondays in either late October or November. In Ms. Chapman's account of the meeting, which she documented in the employee conversation sheet kept in Plaintiff's personnel file, Plaintiff said she was sure the incidents had occurred on November 12, 19 and 26, 2007. Ms. Chapman wrote, "I asked her to be sure. She said yes. [After

6

referring to the work schedules,] I then suspended her because that manager [Chris Carpenter] didn't work open on any of the above days."  (Cooney Dep. Ex. 11.) Believing Plaintiff to be spreading malicious gossip, Ms. Chapman imposed the suspension under work rule three, which prohibits "threatening or abusive language, malicious statements, offensive or disorderly conduct."  (Id.)  In separate handwritten notes, Ms. Chapman further documented that she asked Plaintiff to stay at home so that she could conduct the investigation and "get a true account of what's going on without interference," since Plaintiff had failed to properly follow the open door policy.[4] (Chapman Dep. Ex. 2.)

     After being informed of her suspension and the investigation, Plaintiff recounted in deposition testimony:

> I asked [Chapman] how the investigation was going to go and she told me she was going to talk to [the accused employees].  And I told her that she was violating my civil rights and I wasn't appreciating how I was being treated and that I was going to file a formal complaint with Civil Rights [sic] because I was doing the right thing by coming forward and reporting the drug use.  And I didn't feel it was fair that I was being sent home.

(Cooney Dep. 57:5-12.)  Plaintiff later explained that she intended to file a complaint with the Michigan Department of Civil Rights (MDCR), which she selected because she believed Bob Evans discriminated against female employees by inconsistently enforcing

---

[4]  Plaintiff contests that she failed to follow the open door policy, since she ultimately reported the incidents to Joylyn Fuller, an assistant manager.  In any case, Bob Evans concedes that not following the open door policy is not itself a ground for discharge.

workplace rules.[5]  Specifically, she believed that Terry McKay received preferential

treatment at work because he is male.  She also testified that she felt she had been passed

over for promotions because of her gender: "For the last year that I was there I had asked,

I don't know how many times, to go full-time.  And there was people that came in after

me that worked less hours that got the full-time that were male.  And it bothered me

because I worked six days a week."  (Cooney Dep. 76:5-9.)  After Plaintiff told Ms.

Chapman that she was going to file a complaint, Plaintiff testified that Ms. Chapman

began talking more harshly, became red in the face, and clenched her fists.  Plaintiff

claims that at the time of her suspension she did not know that she was facing possible

discharge.  Ms. Chapman's written records of the meeting only indicate that she told

Plaintiff that the suspension was pending further investigation.

Following the December 14 meeting with Plaintiff, Ms. Chapman continued her

investigation.  She re-interviewed Rodger Watson to ask whether Plaintiff had given him

a ride to work on the specific Mondays in late October and November that Plaintiff

mentioned in the December 14 meeting.  He confirmed that Plaintiff had given him a ride

and that he had not witnessed any drug use on those dates.  Ms. Chapman re-interviewed

Mr. Carpenter, who again denied the allegations.  She also interviewed Terry McKay,

who denied the allegations.  Mr. McKay also told Ms. Chapman that he and Plaintiff had

---

[5]  Plaintiff also explained that she was familiar with that the MDCR because she,
along with several other women, had previously filed a complaint alleging sex
discrimination against a former employer in 1990.

been involved romantically for several months up until October 2007.  Ms. Chapman did

not confront Plaintiff with any of these new facts.  In her deposition, Plaintiff later denied

both that she had given rides to Mr. Watson and that she had been in a relationship with

Mr. McKay.

### D.   PLAINTIFF IS TERMINATED

On December 16, 2007, Ms. Chapman met with Plaintiff and informed her that her

employment was terminated.  The grounds provided were that Plaintiff had not followed

the open door policy, but instead talked to other employees about the allegations,

spreading gossip about Mr. Carpenter and Mr. McKay.  Ms. Chapman also cited

Plaintiff's alleged comments that Mr. Carpenter "didn't want to piss her off" and that she

was angry with Mr. McKay and wanted him fired.  She confronted Plaintiff with Mr.

Watson's testimony that he had ridden to work with her on the alleged days of the

incidents but did not witness any illegal activity.  Finally, Ms. Chapman concluded that

she had found no supporting evidence of Plaintiff's allegations and that she believed the

allegations were made maliciously in violation of the company's work rules.

After termination, Plaintiff testified that she again threatened to file a complaint

with the Michigan Department of Civil Rights.  Although she contacted the MDCR after

termination, she ultimately did not file a complaint and instead chose to pursue a private

cause of action.

On January 23, 2008, Plaintiff filed this action alleging retaliatory discharge.

Specifically, Plaintiff claims that Bob Evans discharged her (1) because she indicated that

she would file a civil rights complaint, in violation of the Michigan Whistleblowers'

Protection Act, Mich. Comp. Laws § 15.362, and (2) because she opposed a violation of

the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2701.

## III.  DISCUSSION

## A.  STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases—Matsushita Electrical Industrial Co. v. Zenith

Radio Corp., 475 U.S. 574 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986);

and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)—ushered in a "new era" in the

standards of review for a summary judgment motion.  These cases, in the aggregate,

lowered the movant's burden on a summary judgment motion.  According to the Celotex

Court,

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon motion,
> against a party who fails to make a showing sufficient to establish the
> existence of an element essential to that party's case, and on which that
> party will bear the burden of proof.

Celotex, 477 U.S. at 322.

After reviewing the above trilogy, the Sixth Circuit established a series of

10

principles to be applied to motions for summary judgment.  They are summarized as

follows:

> •     The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> •     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> •     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> •     The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Betkerur v. Aultman Hospital Association, 78 F.3d 1079, 1087 (6th Cir. 1996).  See also,

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989).  The Court will

apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in

this case.

**B.    PLAINTIFF HAS FAILED TO MAKE OUT A WHISTLEBLOWERS' PROTECTION ACT CLAIM**

Plaintiff's first Count is brought under section 2 of the Michigan Whistleblowers'

Protection Act ("WPA"), which provides in pertinent part:

> An employer shall not discharge . . . an employee . . . because the
> employee, or a person acting on behalf of the employee, reports or is about
> to report, verbally or in writing, a violation or a suspected violation of a law
> or regulation or rule promulgated pursuant to law of this state, a political
> subdivision of this state, or the United States to a public body.

Mich. Comp. Laws § 15.362.

To prevail on a claim under the WPA , a plaintiff must demonstrate that: (1) she was engaged in protected activity as defined by the Act; (2) the defendant discharged her, and (3) a causal connection exists between the protected activity and the discharge. Shallal v. Catholic Soc. Servs. of Wayne County, 455 Mich. 604, 610, 566 N.W.2d 571 (1997). Actions under the WPA are analyzed using the burden-shifting framework utilized in retaliatory discharge actions under Title VII. Taylor v. Modern Engineering, Inc., 252 Mich. App. 655, 662, 653 N.W.2d 625, 630 (2002).

In this case, the parties do not dispute that Plaintiff was discharged from her employment with Bob Evans. Thus, the primary issues before the Court are (1) whether Plaintiff was engaged in protected activity under the WPA and, (2) assuming she was engaged in such activity, whether there is a causal connection between her activity and the discharge.

**1.    Plaintiff was engaged in protected activity when she told Bob Evans management that she was going to file a complaint with the MDCR prior to her discharge.**

Plaintiff argues that although she did not actually report a suspected violation of law, she was nevertheless engaged in protected activity under the "about to report" prong of the WPA. Her claims are based on the statement she made to Ms. Chapman on

12

December 14 and reiterated on December 16, 2007, that she was "going to" file a complaint with the Michigan Department of Civil Rights for being treated unfairly. Defendant counters that because Plaintiff never specifically said that she would report the alleged conduct of Mr. Carpenter or Mr. McKay to a public body, Plaintiff did not engage in protected activity under the WPA. The Court finds that, although the record is minimal, there is sufficient evidence to conclude that Plaintiff was engaged in protected activity.

The Michigan Supreme Court has defined an employee who is "about to report" a violation or a suspected violation as one who "is on the verge of" doing so. Shallal, 566 N.W.2d at 575. "[T]he language of the Whistleblowers' Protection Act intentionally reduces employee protection the more removed the employee is from reporting to a public body." Id. at 576. An employee who is "about to report" a violation of the law receives the same level of protection as an employee who actually reports it to a public body. Mich. Comp. Laws § 15.362.

In order to establish a claim under this prong, plaintiff must ultimately show: (1) by clear and convincing evidence that she or a person acting on her behalf was about to report, verbally or in writing, a violation or a suspected violation of a law of this state to a public body, see Mich. Comp. Laws § 15.363(4); and (2) that the person who fired her was objectively aware that she was about to make a report before she was fired. Kaufman

13

& Payton, P.C. v. Nikkila  200 Mich. App. 250, 257-58, 503 N.W.2d 728, 732 (1993).[6]

The Michigan Supreme Court has recognized that the "clear and convincing evidence

standard" is "the most demanding standard applied in civil cases," and a standard that has

been incorporated into Michigan statutory enactments.  See In re Martin, 450 Mich. 204,

226-27, 227 n. 22, 538 N.W.2d 399 (1995).

> Evidence is clear and convincing when it "produce[s] in the mind of the
> trier of fact a firm belief or conviction as to the truth of the allegations
> sought to be established, evidence so clear, direct and weighty and
> convincing as to enable [the factfinder] to come to a clear conviction,
> without hesitancy, of the truth of the precise facts in issue."  Evidence may
> be uncontroverted, and yet not be "clear and convincing." . . . Conversely,
> evidence may be "clear and convincing" despite the fact that it has been
> contradicted.

In re Martin, 538 N.W.2d at 410 (quoting In re Jobes, 529 A.2d 434 (N.J. 1987)).

In Shallal, the Michigan Supreme Court found "clear and convincing evidence"

that the plaintiff was about to report her supervisor's abuse of alcohol and agency funds

where the plaintiff supported her claim with deposition testimony that she personally

---

[6] Plaintiff makes a procedural argument that she is not required to proffer "clear
and convincing evidence" in opposing Bob Evans' motion for summary judgment, but
rather is only required to show a genuine issue of material fact.  This is not the law.  As
the Sixth Circuit has explained in the context of summary judgment motions, "any
heightened burden of proof required by the substantive law for an element of the
respondent's case, such as proof by clear and convincing evidence, must be satisfied by
the respondent."  Street v. J.C. Bradford & Co., 886 F.2d at 1479; see also Anderson v.
Liberty Lobby, Inc., 106 S. Ct. at 2513 ("[I]n ruling on a motion for summary judgment,
the judge must view the evidence presented through the prism of the substantive
evidentiary burden.")  This Court has accordingly found that the "clear and convincing
evidence" standard applies in evaluating a summary judgment motion on a WPA claim,
Jennings v. County of Washtenaw, 475 F. Supp. 2d 692, 712 (E.D. Mich. 2007), and will
apply this standard here.

14

confronted her supervisor with his violations.  <u>Shallal</u>, 566 N.W.2d at 579.  The plaintiff also corroborated this testimony with entries from her personal calendar that identified by date the people with whom she spoke about her desire to report her supervisor.  <u>Id.</u>  A plurality of the court rejected the notion that a plaintiff should be required to say "magic words" in order to reap the protections of the statute.  It held that plaintiff's statement, "if you don't straighten up . . . I will report [you]," especially coupled with the plaintiff's other actions, established that the plaintiff was engaged in protected activity.  <u>Id.</u>

Similarly, in an unpublished decision the Michigan Court of Appeals found that the plaintiff, a dental hygienist, was "about to report" her employer's illegal billing practices to the Michigan Department of Consumer and Industry Services where the plaintiff submitted evidence that she had copied records, attempted to contact the insurance hotline, and obtained a complaint form, before confronting her employer. <u>Fogwell v. Klein</u>, No. 223761, 2001 WL 1134883 (Mich. Ct. App. Sept. 25, 2001), *lv. denied*, 468 Mich. 864 (2003).  The combination of actions and communication with her supervisor were deemed sufficient to show that the plaintiff was "on the verge" of reporting a violation of law.  <u>See</u> <u>id.</u>

Here, the parties do not dispute that upon learning of her suspension pending further investigation Plaintiff said to Ms. Chapman, she was "going to file a formal complaint with Civil Rights [sic] because [she felt she] was doing the right thing by coming forward and reporting the drug use." (Cooney Dep. 57:9-11.)  Bob Evans instead argues that Plaintiff was not on the verge of reporting because she waited four to seven

15

weeks from the time she allegedly witnessed the drug use to the time she reported it to Bob Evans management.  The company is conflating two suspected violations of law: on the one hand, illegal drug use on company property, and on the other hand, violation of civil rights in the form of discriminatory enforcement of workplace rules.  Though the record is void of evidence that Plaintiff ever planned to report the drug use to a public body, she plainly intended to report the latter suspected violation of law.  Therefore, her delay in reporting the alleged drug use to management is not relevant for purposes of establishing whether her threat to file a civil rights complaint constituted protected activity under the WPA.

Viewing the record in the light most favorable to Plaintiff, her unequivocal statement that she felt she was being treated unfairly and was going to report this to the MDCR is sufficient evidence to conclude that she was "about to report" a suspected violation of law.  The Court notes that unlike Shallal and Fogwell, where the plaintiffs provided evidence of preparative steps or contemplation of reporting a particular violation of law before confronting their respective employers, Plaintiff here has provided only deposition testimony that she had harbored some suspicions about workplace discrimination prior to December 14, 2007.  Nevertheless, Michigan courts have held that the WPA is "a remedial statute and must be liberally construed in favor of the persons it was intended to benefit."  Henry v. City of Detroit  234 Mich. App. 405, 409, 594 N.W.2d 107, 110 (1999).  In addition, the court in Shallal expressly rejected the view that a plaintiff's mere threat to report a suspected violation of law did not show "she had

16

decided actually to do it and do it in the near future." 566 N.W.2d at 577.  The court

ultimately found that a conditional threat alone was credible evidence that she was about

to report.  See id.  In this case, the particular circumstances giving rise to Plaintiff's

grievance—namely the perceived unfairness in how the investigation was conducted and

how disciplinary measures were meted out—began at the earliest on December 11, 2007

when Ms. Chapman initiated the investigation.  Plaintiff did not have a large window of

time within which she could have prepared to report possible violation of her civil rights

or otherwise shared this intent with others.  Thus, the Court looks to Plaintiff's

uncontroverted statement that she was "going to" file a complaint with the MDCR and

her other deposition testimony that she was familiar with the complaint process at the

department.  The MDCR qualifies as a public body under the terms of the statute, Mich.

Comp. Laws § 15.361(d).  Finally, Bob Evans was objectively on notice of Plaintiff's

intent as of December 14, 2007.  Drawing all favorable inferences for the Plaintiff, the

Court concludes that a reasonable jury could conclude that her threat to report a violation

of civil rights qualified as protected activity under the WPA.  The Court now turns to

whether Plaintiff has adduced sufficient evidence of causation.

> **2.     Although Plaintiff may have been engaged in protected activity, she has
> provided insufficient evidence to show a causal connection between her
> threat and the termination of her employment.**

A plaintiff making a WPA claim is required to prove a causal connection between

her protected action and the subsequent discharge.  West v. General Motors Corp., 469

Mich. 177, 665 N.W.2d 468 (2003).  In this case, Plaintiff submits that she has provided

17

sufficient evidence to establish causation because: (1) Plaintiff's discharge came only two days after her threat to file a complaint; (2) Ms. Chapman appeared angry upon hearing Plaintiff's threat; and (3) Plaintiff was not given sufficient opportunity to counter the statements and accusations of her coworkers during the investigation, or the reasons stated for Plaintiff's discharge were plainly insufficient.  Plaintiff further argues that, because Ms. Chapman did not formally decide to discharge Plaintiff until December 15, 2007, *after* Plaintiff made a threat, there is a question of material fact as to whether Plaintiff's threat was a factor in the ultimate decision.  The Court finds these arguments unconvincing in light of the substantial evidence in the record that Bob Evans management began suspecting that Plaintiff had engaged in conduct warranting termination before she made her threat.  Moreover, Plaintiff relies primarily on her own deposition testimony, which, even in the light most favorable to the Plaintiff, casts only a metaphysical doubt as to the material facts.

    First, to satisfy this causation requirement, Plaintiff must show "[s]omething more than a temporal connection between protected conduct and an adverse employment action."  Id. at 473, *quoting* Nguyen v. City of Cleveland, 229 F.3d 559 (6th Cir. 2000); see also Taylor, 653 N.W.2d at 630 ("[T]he short time between plaintiff's participation in protected activity and the termination of plaintiff's employment, without more, is insufficient to establish that the stated reason was a mere pretext."); Henry v. Detroit, 234 Mich. App. 405, 414, 594 N.W.2d 107, 112-13 (1999) (holding that there was sufficient evidence to establish a causal connection where plaintiff presented *both* a temporal

18

connection and plaintiff's unblemished record of service prior to his sudden demotion).[7]

In this case, while it is true that Plaintiff's termination came only two days after her threat

to file a complaint, her termination occurred within the context of Bob

Evans'"Suspension Pending Review" policy.  Under this policy, members of management

suspend employees when they determine that an employee's conduct may warrant

termination.  A hearing for termination is scheduled typically within three days after the

employee is suspended.  Here, Plaintiff made her threat once the suspension policy had

already been set in motion.  The bulk of the investigation into Plaintiff's allegations and

her suspension occurred before she threatened to file a complaint at the December 14,

2007 meeting.  Even if the ultimate decision to terminate Plaintiff's employment came

---

[7] Plaintiff cites Sixth Circuit case law to suggest that temporal proximity *can* raise a sufficient inference that the protected activity was the likely reason for the discharge. The law appears to be unclear on this point.  Compare Nguyen, 229 F.3d at 565-67 (6th Cir.2000) (holding that temporal proximity alone is generally insufficient to raise an inference of retaliation), *with* Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir.2004) (holding that temporal proximity alone (3 months) is sufficient to establish an inference of retaliation) *and* Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107, 1118-19 (6th Cir. 1996) (holding that an inference of retaliation was warranted when the plaintiff's employment terminated one year and three months after he filed a complaint against his employer, though arguably considering other evidence in conjunction with temporal proximity), *abrogated on other grounds as recognized by* Jackson v. Quanex Corp., 191 F.3d 647, 667 n. 6 (6th Cir. 1999).  In an unpublished opinion, the Sixth Circuit sought to reconcile this apparent conflict by finding that although temporal proximity is relevant to the question of causation, standing alone, it is only sufficient to establish an inference of retaliation "when there is no compelling evidence to the contrary."  Steiner v. Henderson, 121 Fed. Appx. 622, 626, 2005 WL 221530, at *4 (6th Cir. 2005).  Finally, these cases arise out of Title VII litigation, which may serve as useful guidance, but are not binding here where the Court must apply Michigan law.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938); DeFlaviis v. Lord & Taylor, Inc., 223 Mich. App. 432, 437, 566 N.W.2d 661, 664 (1997).

after the threat, Ms. Chapman, reasonably or unreasonably, had already formed the belief that Plaintiff's conduct may warrant termination and had begun disciplinary action pursuant to the suspension policy *before* Plaintiff engaged in protected activity.

Second, Plaintiff's testimony that Ms. Chapman's appeared "mad" when Plaintiff threatened to file a complaint is insufficient to support a causal connection. See Goodman v. Genesee County, No. 266955, 2006 WL 2270411, at *7 (Mich. App. 2006) (holding that supervisor's statement that he was not pleased by employee's intent to report a violation of law, even in combination with temporal proximity to demotion or discharge, does not fulfill the causation requirement). Plaintiff cites Roulston v. Tendercare, Inc., 239 Mich. App. 270, 280, 608 N.W.2d 525, 530 (2000), in which the court found that temporal proximity combined with the supervisor's angry demeanor, saying "you're through," and standing by until the plaintiff collected her belongings and left the building mere hours after the plaintiff engaged in protected activity, were sufficient to suggest a causal connection between the plaintiff's protected activity and her discharge. However, in this case Ms. Chapman neither said nor did anything, beyond appearing angry or flustered, that would indicate her intent to retaliate. Unlike Roulston, Plaintiff has submitted no evidence of actual conduct or statements made by Bob Evans management to suggest that Plaintiff's threat changed the way Ms. Chapman carried out the remainder of her investigation. On the contrary, even if Ms. Chapman was angry, she concluded the meeting with Plaintiff on December 14 by indicating that she planned to continue the investigation and interview others to verify the truth of Plaintiff's

20

allegations.  The following day, Ms. Chapman conducted several additional interviews before reaching her final decision.

Third, Plaintiff's argument that she was not given sufficient opportunity to rebut the statements made by co-workers and that the ultimate decision to fire her was baseless are unsubstantiated by the record.  Under the terms of the suspension pending review policy, Plaintiff could have contacted Ms. Chapman or any other member of management at any point during her suspension to ensure that the investigation included all the facts which she believed would help explain the circumstances surrounding her suspension. She has not provided any evidence that she attempted to do so or was denied the opportunity after she was suspended.  Moreover, Bob Evans has provided ample evidence that it sought to weigh Plaintiff's allegations against the testimony of her co-workers. Ultimately, Bob Evans concluded that Plaintiff was spreading malicious rumors about the two accused employees based on the following findings:

- Plaintiff delayed four to six weeks between the time that she saw the alleged drug incidents and the time she reported the incidents to management.  In that window, she talked about the allegations with at least two non-managerial employees.

- Ms. Fuller reported that Plaintiff had said that Mr. Carpenter "had a target on her head," when she chose to approach Ms. Fuller to discuss the drug use incidents.

- Ms. Watson reported that Plaintiff had said that Mr. Carpenter "didn't want to piss her off" because she knew he had used marijuana on company property.

- Mr. McKay reported that he and Plaintiff had been in a romantic relationship that had ended prior to the alleged incidents.

21

- Ms. Blalock reported that Plaintiff told her she was mad at Mr. McKay and wanted him fired.

- Mr. Watson reported that he rode to work with Plaintiff on the alleged Monday mornings in October and November and that he did not witness any drug use.

- Plaintiff first alleged that she saw the drug use on specific dates in November, then later recanted and said they may have happened in late October when confronted with the work schedules of the accused employees indicating that Mr. Carpenter had not worked on the given days.

Plaintiff argues that these reasons could not form the actual basis of Ms. Chapman's ultimate decision because each was factually contested by her own testimony. Even assuming that there was a genuine issue of material fact with respect to each underlying assertion, the Court still fails to find a causal connection between Plaintiff's threat to file a complaint and her eventual discharge. Bob Evans has provided ample evidence that Ms. Chapman formed her belief that Plaintiff was engaged in conduct that violated work place rules on the basis of these findings, in the form of Ms. Chapman's handwritten notes made contemporaneously with the investigation, accompanied by the written and signed statements of the interviewed employees. Ms. Chapman conducted the interviews, requested that the employee statements be memorialized in writing, met with the Plaintiff and reviewed work schedules for the relevant dates before Plaintiff made her threat. It is undisputed that Ms. Chapman sought to reconcile Plaintiff's allegations with the conflicting testimony of other employees before reaching her final decision to terminate Plaintiff's employment. The Court finds that although Plaintiff's deposition testimony

22

may cast a shadow on the enumerated bases for Bob Evans' employment action, it is insufficient to create an genuine issue of material fact.

Finally, Defendant argues that Plaintiff's claims fail to meet the public motivation requirement set out in <u>Shallal</u>.  Michigan courts do not extend WPA protection when an employee acts in bad faith: "The primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern." <u>Shallal</u>, 566 N.W.2d at 579 (international quotation and citation omitted).  In <u>Shallal</u>, the Michigan Supreme Court held that, although the plaintiff was engaged in protected activity, she failed to establish the necessary causal connection because the plaintiff knew her discharge was imminent when she made her threat.  <u>Id.</u>  The court held:

> Plaintiff cannot use the Whistleblowers' Act as a shield against being fired where she knew she was going to be fired before threatening to report her supervisor.  To hold otherwise would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so.  Plaintiff has offered no evidence which suggests that the Michigan Legislature intended the Whistleblowers Act to be used as an offensive weapon by disgruntled employees.

<u>Id.</u> (internal quotations and citations omitted).  Put differently, the WPA will not protect an employee who has reason to believe that her job may be in jeopardy and who engages in protected activity merely "to extort [her employer] not to fire [her]."  <u>Id.</u>  Plaintiff counters that because she did not know that her suspension was *pending discharge* and because the decision to terminate her was not made until after she made the threat, she could not have intended to extort her employer into letting her keep her job.  In addition, she argues that while she may have had her own employment interests in mind, she could

23

have also wanted to report sex discrimination in the interest of the public, citing Trepanier v. National Amusements, Inc., 250 Mich. App. 578, 649 N.W.2d 754 (2002).  In Trepanier, an employee filed a personal protective order against his co-worker based on harassment outside the workplace.  649 N.W.2d at 756.  After concluding that the filing a PPO could qualify as protected activity under the WPA, the court found that although plaintiff's primary purpose may have been to protect himself from harassment, "a reasonable jury could conclude that plaintiff was acting in the public's interest, in addition to his own."  Id. at 759.  Here, the Court finds that WPA protection is inappropriate where Plaintiff was plainly aware that she was facing some form of disciplinary measures or adverse employment action when she made her threat.  Although Plaintiff may have had a "desire to inform the public on matters of public concern" in addition to serving her own employment interests, unlike Trepanier, where the employee filed a PPO separately from and prior to approaching his employer to complain about a hostile work environment, see id. at 756, Plaintiff only threatened to file a suit once she learned she had been suspended.  Plaintiff's subjective understanding of the nature of the suspension or investigative process does not render the reasoning in Shallal inapplicable.  Rather, her knowledge that she faced an adverse employment action is sufficient to suggest that her subsequent threat was made to pressure Bob Evans into withdrawing the suspension.

Based on the foregoing, the Court is unable to conclude that Plaintiff has provided sufficient evidence of a causal connection between her threat to file a complaint and the

termination of her employment.  Therefore, the Court finds that Plaintiff has failed to

make out a *prima facie* case for retaliatory discharge, and it does not reach the second and

third steps of the burden-shifting analysis.

## C.     PLAINTIFF HAS FAILED TO MAKE OUT A CIVIL RIGHTS ACT CLAIM.

Plaintiff's second Count alleges that Bob Evans violated the anti-retaliation

provisions of the Elliott-Larsen Civil Rights Act ("ELCRA") by terminating her

employment as retribution for stating her intention to file a civil rights claim.  The Act

prohibits retaliation against a person "because the person has opposed a violation of this

act, or because the person has made a charge, filed a complaint, testified, assisted or

participated in an investigation, proceeding or hearing under the act."  Mich. Comp. Laws

§ 37.2701(a).  Like WPA claims, a plaintiff alleging retaliatory discharge under the

ELCRA must show: (1) that the plaintiff engaged in a protected activity, (2) that this was

known by the defendant, (3) that the defendant took an employment action adverse to the

plaintiff, and (4) that there was a causal connection between the protected activity and the

adverse employment action.  Barrett v. Kirtland Community College, 245 Mich. App.

306, 315, 628 N.W.2d 63 (2001).  Unlike WPA claims, the Civil Rights Act does not

protect plaintiffs who are "about to report" a suspected violation of the Act.  In addition,

to establish causation under the ELCRA, the plaintiff must show that his participation in

activity protected by the Act was a "significant factor" in the employer's adverse

employment action, not just that there was a causal link between the two.  Id.; see also

<u>Jacklyn v. Schering-Plough Healthcare Products Sales Corp.</u>, 176 F.3d 921, 929 (6th Cir.

1999).

The parties do not dispute that at the time of her discharge Plaintiff had not yet

"made a charge, filed a complaint, testified, assisted, or participated in" proceedings

under the Act.  Thus, any claim of illegal retaliatory conduct arises from Plaintiff's

opposition to a violation of the Civil Rights Act.  To receive protection,

> An employee need not specifically cite the CRA when making a charge
> under the act.  *However, the employee must do more than generally assert
> unfair treatment.*  The employee's charge must clearly convey to an
> objective employer that the employee is raising the specter of a claim of
> unlawful discrimination pursuant to the CRA.

<u>Barrett</u>, 628 N.W.2d at 72 (internal citations omitted and emphasis added).  Where the

evidence establishes that the plaintiff was merely asserting "generic, non-sex-based

complaints regarding working conditions," a claim for retaliation has not been proven. <u>Id.</u>

Plaintiff's single statement that she felt her civil rights were being violated because

she had reported wrong-doing are insufficient to show that she was make a complaint

about sex discrimination or indeed opposing a violation of the ELCRA.  Plaintiff never

directly told Bob Evans management that she was treated differently because of her

gender and has presented no evidence that, despite harboring some suspicion of

preferential treatment of males, she ever brought these concerns to the attention of Bob

Evans management.  Rather, Plaintiff merely alleged general "unfair treatment" in the

application of disciplinary measures.  Under these circumstances, an objective employer

could not conclude that Plaintiff was raising the specter of a claim pursuant to the

26

ELCRA even if she uttered the words "civil rights."   In addition, assuming *arguendo* that

Plaintiff's threat constituted protected activity under the ELCRA, as discussed in the

preceding section, Plaintiff has adduced insufficient evidence from which a reasonable

jury could conclude that her threat to file a civil rights complaint was a "significant

factor" in or even causally connected to Bob Evans' employment decision.  For the

foregoing reasons, the Court finds that Plaintiff cannot sustain a retaliatory discharge

claim under the Elliott-Larsen Civil Rights Act as a matter of law.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Bob Evans'

September 24, 2008 Motion for Summary Judgment is GRANTED.


<u>s/Gerald E. Rosen                                     </u>
Gerald E. Rosen
Chief Judge, United States District Court

Dated: August 17, 2009


I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 17, 2009, by electronic and/or ordinary mail.

<u>s/Ruth A. Brissaud                          </u>
Case Manager
(313) 234-5137

27